## A01A0802. FORD v. SMITH et al.
(546 SE2d 346)

ELDRIDGE, Judge.

This is an appeal from the Superior Court of Fulton County's grant of summary judgment to plaintiffs Bryan Smith et al. ("appellees")[1] in their negligence suit against defendant Patrick J. Ford. For the reasons that follow, we reverse.

Viewing all facts and inferences in a light most favorable to the nonmovant, Ford,[2] the record shows that the instant case stemmed

---

[1] Joe Garrick, Gary Holst, William Holloway, Allan Maged, Waldo Gabaldon, Larry Bradley, Phil Walsh, James Wright, Joel Lowman, Timothy McDaniel, Jerry Fox, Robert Wager, Robby Cardwell, Rodger Fordham, Dean Spainhower, and Steven McKay.

[2] *Jordan v. Atlanta Replex Corp.*, 228 Ga. App. 670, 672-673 (492 SE2d 536) (1997).

from the actions of Alan Lloyd Schall, who established a group of companies, collectively "Ecotech,"[3] in the fall of 1995. Schall promoted Ecotech as providing allegedly soon to be legally mandatory lead-based paint inspections prior to real estate purchases. Ecotech purportedly offered a "Safe Seal" certification of inspection that would, according to Schall, prove to be invaluable/necessary in the sale of environmentally safe homes.

In advancing the sale of licenses to conduct Ecotech inspections, Schall advertised nationally, sending out information packets containing, inter alia, brochures which made representations about the volume of Ecotech's business; about the benefits of using "Safe Seal" to market environmentally sound homes; and about the extensive technical and marketing support that would be provided to license purchasers.

Appellant Ford is a bartender at Café 290, a restaurant that has a bar patronized frequently by Schall. Ford also worked a second job as a realtor in the Sandy Springs office of Prudential Realty of Georgia, Inc. ("Prudential"). Over the course of multiple conversations at the Café 290 bar, Schall told Ford about his Ecotech business, explaining the benefits of the "Safe Seal" certification in relation to lead-based paint contamination. Schall sent Ford his advertising packets touting Ecotech's services. As a part-time realtor, Ford was aware of the controversy surrounding lead-based paint. He discussed the inspection company with colleagues in his Prudential office, showed them the advertising packets, and offered them the use of a limited number of free inspection coupons that Schall had given him. Ford also spoke with clients and "people at the bar" about Ecotech. He encouraged his clients to call Ecotech's office for more information about its service.

Over the course of many conversations with Schall at Café 290, Ford decided that he wanted to be a part of Ecotech because, "wow, this thing is going to be hot." Due to the lead paint contamination stories that were highlighting the news cycle at the time, Ford decided that Ecotech's inspections would become legally mandatory and that Ecotech's services would then be required; to Ford, Ecotech "looked like it could have been something that could have led to money in the future." In his desire to affiliate himself with the potentially profitable Ecotech services, Ford agreed when Schall asked him

---

[3] Ecotech Environmental Inspectors, Inc.; Ecotech Environmental Inspectors Metro Atlanta, Inc.; and Safe Environment Certification Services, Inc.

to write a letter recommending the environmental inspection services offered by Ecotech:

> I thought that it was a good service. I did not mind writing the letter. I did not mind helping Alan out. If this thing took off, and I did believe it took off, I did not have money to invest in it; and I don't know if I believed in it enough to throw in [$]50,000 or whatever, but I thought it was big. I thought it was going to be big enough that I wanted to keep my foot in the door.

On Prudential letterhead, Ford wrote a letter addressed to Schall and expressing his belief that Ecotech's environmental inspection services were highly desirable in the marketing of homes:

> Thank you for sending me the information packets on your new environmental inspection service. I have shared the information with my clients and with other Realtors in my office and the response has been impressive. You are undoubtedly aware of this from the many people I have had call your office for more information. Your service will fill a niche that has surprisingly been overlooked until now. Throughout our industry more laws are being passed to protect the Home Buyer with better representation of responsibility to the Home Buyer insuring that we will look out for their best interest. The Environmental Protection Agency is also playing a tougher role by enacting new laws requiring that homes meet even safer guidelines. Since I specialize in Buyer Agency, any service that exposes potential problems and certifies all safe areas is of enormous value to the continued success of my business. I am given the task of finding the perfect home for my clients. Beyond finding the right sized home in the right location for a good price, your inspections will guarantee that I cross more finish lines by detecting unseen hazardous conditions. These are real concerns that a growing number of home owners are becoming aware of, and I believe that these inspections will prove to be a part of all future home sales.

In addition, Schall asked Ford to provide a house or houses to use for demonstrations of Ecotech's inspections to potential license buyers so that they could "learn how to do an inspection." Schall told Ford that he would provide free inspections to the owners who allowed their homes to be used for demonstrations. As a favor to Schall, Ford agreed and arranged with several of his friends to use

their homes for Ecotech demonstrations in exchange for a free inspection.

Thereafter, when potential license buyers came to Atlanta for training in Ecotech inspections, Ford was contacted; he met the potential license buyers and the inspection trainer at the Ecotech office; and, driving alone, Ford led the trainer and potential license buyers to a demonstration house so that the inspection techniques could be taught. Ford had little interaction with the prospective license purchasers, was not involved in the demonstration process, and made no representations about Ecotech as a license opportunity.

For his cooperation, Schall would leave large bar tips for Ford:

> So when he would come and visit me in bartending, he would tip. A lot of times he would tip a lot of money. I was on the assumption that he did have a lot of money. . . . It seemed to me like the guy had a lot of money. When he would come at the bar, he would have a couple of drinks. He would sometimes — it wouldn't be odd for him to throw down a hundred dollar bill and say keep it. . . . So, in essence, it was a bar tip, but he was probably saying thanks for helping me out also.

Sometimes Schall, whom Ford described as a "horrible alcoholic," would walk out on a Café 290 bar tab and pay Ford when Ford next saw him at the Ecotech office: "I went to see him the next day, and he said, 'Oh, I owe you for a tab,' and he went ahead and slid a couple hundreds my way."

Additionally, Schall had previously told Ford that he would be in the market to buy a house in the near future. By doing favors for Schall, Ford hoped to act as Schall's agent and obtain the commission for what Ford was sure would be an expensive new home purchase.

However, as it turned out and allegedly unbeknownst to Ford, Schall had removed Ford's name from the letter Ford wrote and put the letter in his advertising packets, describing it as a recommendation from a Prudential agent who had actually used Ecotech and found that an Ecotech "Safe Seal" certification in fact boosted Prudential's home sales significantly. Also allegedly unbeknownst to Ford, Schall told the visiting potential license purchasers that the houses to which Ford took them were actually listed for sale; that the home owners had actually purchased Ecotech's inspection service; and that they were witnessing an actual, purchased Ecotech inspection.

As a result of these misrepresentations and others, many of the visiting potential license purchasers, i.e., appellees, bought Ecotech licenses and suffered money losses of various amounts when it became apparent that, contrary to Schall's representations, Ecotech

was an illusory company; there was no legal need or market for environmental inspection services; there was no technical or marketing support for Ecotech license purchasers; and, without explanation, Ecotech folded in early 1997.

Appellees filed suit against Schall and Ecotech for fraud and against Ford and Prudential for negligence. The case went to trial before a jury in January 1999. During trial, appellees introduced Ford's letter to Schall, evidence that Schall gave Ford large "tips" for his cooperation, and evidence that Ford took appellees to various houses in order to witness inspections. A large portion of the evidence of Ford's culpability came from a former Ecotech "employee," Marc Glaser, who testified for appellees about Ford's acceptance of money from Schall and Ford's apparent knowledge of Schall's activities.

At trial, Ford was called for cross-examination during the appellees' case, and he also testified in his own behalf during the defense case. He offered explanation for the letter to Schall, claiming he did not know to what purpose Schall would put the letter:

> You know, I never really thought of what he would be using it for, but at the time he was just starting the business, and I thought that he, that he wanted a letter just from a realtor saying that this was a good service. That's as far as I thought in my head. It took no time to write the letter. He had told me about the business. What he was going to be doing. How people were being trained in Georgia Tech. When he said Georgia Tech, I was like, wow, this guy must be for real. When I started hearing things from lawyers saying that, you know, this [lead-based paint contamination] was going to be a big problem. You really have to watch out for it. I thought, wow, this sounds like a good idea. He asked me would you write me a letter. No problem. I will write you a letter. Took me about ten minutes, ten minutes to write. I did put it on Prudential stationery. I didn't put it on Café 290 stationery. Maybe I should have, but I put it on Prudential stationery, and I gave it to him.

Ford testified that he believed that what he said in the letter was true:

> When I was writing this letter, I did not make any intention of making any false statements. I would not have done that in reading, so I still do not believe that anything I have said in this thing is false or misleading. . . . I had no idea whatsoever. If somebody was thinking that it might be a good service, I bought into it. I believed it, and I would have told. I stand — I stood behind it. . . . He had asked me to write a letter. As far as me thinking when I did that, I wrote a let-

ter, and that was as far as I thought. I believed what I wrote. So that was it.

Ford testified that he thought the "inspections" were simply demonstrations for teaching purposes and he was not aware that Schall had told the appellees otherwise:

It was explained to me by Alan that he needed a house to use to teach people how to do inspections. It made sense to me. He was telling me that people were going to come in. They were thinking about getting into the business. So he was going to show them his operation. He was going to show them what his office was like, how they did everything in his office, and then he was going to teach them how, teach them how to do a demonstration or teach them how to do an inspection.

Ford testified that he had little contact or conversation with appellees and that they were mistaken if they believed Ford told them he actually used Ecotech or made representations about Ecotech, itself, as opposed to stating his belief in the type of environmental service Ecotech purported to offer. Ford testified that Glaser was "lying" about Ford's involvement in and/or knowledge of Schall's misrepresentations to appellees: "If you are [asking] if it was Marc telling the truth, I would think that everything that came out of the guy's mouth was a lie."

In addition, during cross-examination of the appellees, Ford attempted to establish appellees' failure to exercise due diligence in ascertaining the viability of Ecotech, such as requesting and reviewing financial statements, data, or tax returns; conducting a market analysis; or independently confirming the multiple representations made in the license advertising packets.

Ford's defense was that he was a "pawn" who was taken in and used by Schall, just as the appellees were; that Ford had no legal duty to appellees that was violated by his unwitting, voluntary favors to Schall; and that Ford's unwitting actions were not the proximate cause of appellees' money loss; Schall's misrepresentations as to Ford's actions were. In addition, the trial court charged the jury on comparative negligence and contributory negligence.

The jury found for appellees as to their fraud claim against Schall and Ecotech. However, the jury found in favor of Ford and Prudential as to appellees' negligence claim. The trial court granted appellees' motion for new trial as to Ford only. Thereafter, the trial court granted appellees' motion for summary judgment against Ford. In that regard, the trial court concluded that there was no material issue of fact for jury determination and that the previous jury ver-

dict, "inexplicably" in Ford's favor, must have been the result of either confusion over the jury charge or emotion.[4] *Held*:

To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.[5]

> Except in plain, palpable and undisputed cases where reasonable minds cannot differ as to the conclusions to be reached, questions of negligence, proximate cause, including the related issues of foreseeability, assumption of risk, lack of ordinary care for one's own safety, lack of ordinary care in avoiding the consequences of another's negligence, contributory and comparative negligence are for the jury.[6]

Notably, in this case the jury found for Ford. And while the trial court obviously disagreed with the jury's verdict and granted appellees' motion for new trial — an act which calls for a standard of review attributing deference to the trial court's determination[7] — that is not the posture in which this case comes to us. The trial court then went further and granted appellees' motion for summary judgment, in essence directing a verdict for appellees. In both such instances, summary judgment and directed verdict, the evidence of record and all reasonable inferences drawn therefrom are viewed in favor of Ford.[8]

Here, in so viewing the evidence, there are material issues of fact as to: (1) whether there existed a legal duty on Ford's part toward appellees; (2) whether Ford's belief in Ecotech's services and his "favors" for Schall with regard thereto can be considered a deviation from a standard of ordinary care when appellees — one of whom was

---

[4] During the course of the trial, Schall — who was acting pro se — absented himself from the trial and was not seen again. In its order granting summary judgment to appellees, the trial court opined that the jury's verdict may have been the result of their belief that Ford would have to pay the entire amount of damages if they found against him.

[5] *Tuggle v. Helms*, 231 Ga. App. 899, 901 (499 SE2d 365) (1998).

[6] (Citation and punctuation omitted.) *Stegall v. Central Ga. Elec. Membership Corp.*, 221 Ga. App. 187, 190 (2) (470 SE2d 782) (1996).

[7] OCGA § 5-5-50.

[8] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); see also *K-Mart Corp. v. Jackson*, 239 Ga. App. 176 (521 SE2d 93) (1999) ("In reviewing the trial court's [grant] of a motion for directed verdict, we construe the evidence most favorably to the party opposing the motion, and we will . . . reverse the ruling unless the evidence and all reasonable deductions therefrom demand a particular verdict.").

a licensed real estate agent, one of whom was married to a licensed real estate agent, and two of whom were employed in occupations associated with environmental inspections — allegedly exercised due diligence, yet failed to uncover Schall's "Ecotech" scheme; and (3) whether Ford's actions, when stripped of the misrepresentations allegedly placed on them by Schall, were the proximate cause of appellees' injuries. The resolution of these issues turns on whether one believes Ford's version of events or that of appellees. Under the facts of record, questions also arise as to how much responsibility appellees bear for their own predicament by the failure to exercise sufficient due diligence before investing in Ecotech, thereby making applicable a jury's consideration of contributory negligence and comparative negligence. Clearly, regardless of the trial court's speculation about the reasons for the jury's verdict, the record — including the prior verdict — shows that "reasonable minds can differ" as to the conclusion that should be reached in this case. "On the record before us, it is for the jury to determine whether more credit is to be given to the [appellees' evidence] than to appellant['s]. Where a question of credibility arises as to a material issue, summary judgment should not be granted."[9]

*Judgment reversed. Andrews, P. J., and Miller, J., concur.*

DECIDED FEBRUARY 28, 2001 — 

*Owen, Gleaton, Egan, Jones & Sweeney, Philippa V. Tibbs, Goetz & Zahler, Charles M. Goetz, Jr.*, for appellant.

*Austin & Sparks, John T. Sparks, Malcolm & Schroeder, John G. Malcolm, Robert F. Schroeder*, for appellees.

---

[9] (Citations and punctuation omitted.) *Hill v. All Seasons Florist*, 201 Ga. App. 870, 872 (412 SE2d 619) (1991).