[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 25, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10510

_____

D. C. Docket No. 05-01610-CV-BBM-1

TRACYE CURRIE,
Individually and as Surviving
Mother and Personal Representative
of the Estate of Nodiana Antoine,
deceased,

Plaintiff-Appellee,

versus

CHEVRON U.S.A., INC.,
CHEVRON STATION, INC.,

Defendants-Appellants.

_____

No. 07-10749

_____

TRACYE CURRIE,
Individually and as Surviving
Mother and Personal Representative
of the Estate of Nodiana Antoine,
Deceased,

Plaintiff-Appellant,

versus

CHEVRON U.S.A., INC.,
CHEVRON STATION, INC.,

Defendants-Appellees.

––––––––––––––––––––––––––

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(February 25, 2008)**

Before HULL and PRYOR, Circuit Judges, and MOORE[*], District Judge.

PER CURIAM:

In this diversity case controlled by Georgia law, defendants Chevron U.S.A.,

Inc. and Chevron Stations, Inc. (collectively "Chevron") appeal the entry of a

$2,625,000 judgment against them for negligently causing the death of Nodiana

_____

[*]Honorable K. Michael Moore, United States District Judge for the Southern District of Florida, sitting by designation.

2

Antoine ("Antoine"). Antoine's mother Tracye Currie ("Currie") brought this wrongful death suit against Chevron, alleging that Antoine died of burns she received after Chevron's employee, Jyotika Shukla ("Shukla"), negligently activated a gas pump for Anjail Muhammad ("Muhammad"). More specifically, Currie contended at trial that Chevron's Shukla negligently activated the gas pump for Muhammad only after: (1) Shukla saw Muhammad pulling Antoine around the Chevron station's property by her shirt and thought that something was wrong; (2) Shukla saw that Muhammad and Antoine did not have a vehicle; and (3) customer Pamela Robinson warned Shukla that there was a problem with the two women outside, asked Shukla to call the police, and showed Shukla where the two women were standing by gas pump number one. Currie claimed that, given this evidence, Shukla should have foreseen that Antoine would suffer some injury as a result of Shukla's activating the gas pump for Muhammad.

On appeal, Chevron argues that the district court erred in denying its motion for judgment as a matter of law or, alternatively, a new trial based on the Georgia law defenses that (1) Muhammad's actions were unforeseeable and broke the chain of causation, (2) Antoine failed to exercise ordinary care for her own safety to avoid the consequences of Chevron's negligence, (3) Antoine had superior knowledge than Chevron of the danger posed by Muhammad, and (4) Antoine's

3

negligence was equal or greater than Chevron's negligence. Chevron also claims several jury instructions were erroneous.

After review and oral argument, we conclude that there were significant conflicts in the evidence about the incident in this case and that under Georgia law the district court did not err in submitting the case to the jury and denying Chevron's motion for judgment as a matter of law or for a new trial. Thus, we affirm the district court's judgment.

## I. BACKGROUND

### A. Trial Evidence

#### 1. Events prior to May 25, 2003 Incident

In 2001, Antoine left high school and moved to Gadsden, Alabama to enroll in Job Corps, a vocational training program. She met Muhammad, who was also in Job Corps, and the two women began an intimate relationship some time in 2002. Muhammad left the Job Corps in the fall of 2002 and moved away from Gadsden. The two women temporarily ended their relationship, and Antoine started dating a woman named Nicole. Muhammad eventually returned to Gadsden, and she and Antoine resumed their relationship. In March 2003, Antoine and Muhammad moved into a house together in Gadsden.

Courtney Yelder Manus, who described herself as being "best friends" with

4

Antoine while they were in Job Corps together, testified that Muhammad would become upset if she ever saw Antoine and Nicole near each other. Manus witnessed Muhammad make threats to Nicole that Muhammad would "kick her ass" or kill her.[1] Manus testified regarding one such incident where Antoine had to calm Muhammad down when Muhammad got upset at Nicole. Manus described that Antoine was "[j]ust trying to calm [Muhammad] down and get her – we were trying to leave and she wanted to get her in the car so she just kind of, you know, pushed her toward the car and tried to calm her down."

Manus also heard Muhammad threaten to harm Antoine if she was in a relationship with anyone else. At first, Manus thought that Muhammad was joking, but over time she became more concerned for Antoine. Manus observed superficial scratch marks on Antoine's neck and bruises on Antoine's arm and chest. In their last conversation, approximately two weeks before the incident at the Chevron station, Antoine acknowledged to Manus that she needed to get out of the relationship.

In the weeks preceding May 25, 2003, Antoine and Muhammad moved out of their home in Alabama and were living out of Muhammad's car.

---

[1]Manus testified that she overheard Muhammad on a separate occasion tell a story about shooting her ex-husband. Manus admitted, however, that she never learned if Muhammad's story was true and that a detective had told her that there were no prior assault charges against Muhammad by her ex-husband.

5

### 2. Events on May 25, 2003

On the morning of May 25th, Muhammad had parked her car in a restaurant parking lot in Marietta, Georgia. According to Muhammad's statement to police later in the day on May 25th, Muhammad and Antoine got into an argument over a lost battery.[2] In the course of the argument, Antoine told Muhammad that she was tired and was leaving the relationship. Muhammad told police that she became angry because she had given up a lot for their relationship. Antoine left Muhammad's car and started walking toward the Chevron gas station across the street to call her family. Muhammad followed her, and the women continued arguing as they walked across the street.

Pamela Robinson, a customer at the Chevron gas station, testified that she pulled into the Chevron station to get gasoline for her car and heard a loud noise behind her as she was still sitting in her car. Robinson looked behind her and saw two young women approaching from across the street. Robinson stayed in her car for a moment because the situation "just didn't look quite right." She observed that the smaller woman (Muhammad) had her fist wrapped tightly in the shirt of

---

[2]Muhammad was not called to testify at trial. At her deposition, Muhammad invoked her Fifth Amendment privilege after each question asked of her. The district court later denied Chevron's motion to add Muhammad as a third-party defendant. At trial, portions of Muhammad's interview with police were read and a redacted transcript of the interview was admitted.

the larger woman (Antoine). Robinson testified that she "noticed that the one lady that was being held tried to pull away from her, and at that point the other young lady wrapped her hand even tighter around her t-shirt around her neck right here and she pulled her, just pulled her back down to the ground like an animal or something, and they proceeded walking." Antoine was "pretty much being dragged" and looked "kind of scared." Currie's counsel asked, "Was the one lady still holding the other lady by the collar when they were on Chevron property?" Robinson responded, "Yes. She never let her go in my sight" and "She had a hold of her the whole time."

Robinson watched the two women walk behind her car in the direction of gas pump number one and the Chevron station's restrooms. Robinson then got out of her car to pump gas. She lifted the gas pump lever but the pump did not activate. Robinson then went inside the Chevron station to have her gas pump activated.

Shukla was the cashier at the Chevron station on that day and was working by herself.[3] Robinson testified that she entered the station and "told the clerk immediately that there was something going on with the two young ladies out here and that she needed to contact the police immediately." Robinson explained that

_____

[3]Shukla's testimony suggests that there was another Chevron employee on duty on this morning, but that the employee was taking a break at the time this all occurred.

she then "showed [Shukla] that the two young ladies was over there in that area, and all I could see of the person was just a portion of the side of their clothing. From where I was standing in the front of the store out to where the pump number one is." Currie's counsel asked Robinson, "So while you were talking to Ms. Shukla, you could see one of the women at pump one?" Robinson replied, "You could see a portion of their clothes."

Shukla, who is from India and is not a native English speaker, testified without an interpreter that she did not know that there was anything wrong outside until customer Robinson came into the station and told her. Shukla contended that she saw the two women "verbally fighting" and that one woman was holding the other by her shirt. Shukla then testified that the women were leaving the property when she saw them and that five or ten minutes passed before they actually left the property. Thus, Shukla has the women fighting as they left the Chevron property.

When asked at trial why she did not call the police after Robinson requested her to do so, Shukla testified that she felt it was unnecessary because the women's fighting was not that bad and they were leaving the property. This contrasted with Shukla's deposition testimony, which Currie's counsel read to her during direct examination, that it was not her responsibility to call the police because the couple

was fighting outside, not inside the store.[4]

Furthermore, Shukla's statement to the police on the day of the incident, which was drafted by a police officer because Shukla did not write well in English, suggested that she also saw the two women in the station's parking lot and thought something was wrong even <u>before</u> Robinson came into the station. Shukla's statement to police provided, in full:

> wk @ Chevron . . . wk alone came to work @ 8 AM saw 2 ladies walking in p. lot - did not see their car - she thought something was wrong. Customer came in they talked about the 2 women She saw lady in yellow shirt grabbed the other lady by the front of the shirt pulled her. Customer said called police one of the women pumped .65 gas - doesn't know which one - pump was not hung up. After helping 3 customers she came out to talk to the other customer & saw one of the women across street on fire.

---

[4]The exchange at trial between Currie's counsel and Shukla was as follows:
[Currie's counsel]: Didn't you tell us before under oath that the reason you didn't call the police was because they were fighting outside on station property, not inside the store, so therefore it wasn't your responsibility to call the police; isn't that what you told us before under oath?
[Shukla]: Like inside means inside my store, and they are – I saw them outside near the restroom. But on that time they were just walking and they were leaving our property, so I told my customer it's not needed.
. . .
[Currie's counsel]: Question, why didn't you call the police when the women were fighting at the gas station? Answer, they were fighting and they were fighting outside the gas station, you know, they were not fighting inside, and so it's not my responsibility to call the police.
     Did I read that correctly?
[Shukla]: Yes.
[Currie's counsel]: Did the translator make another mistake or is that what you said?
[Shukla]: No. I said that, but – and I say then it was too bad, so it's not necessary. Yeah, it's my responsibility to take care, but it was not bad at all and they were leaving our property, so I said we didn't need it.

9

Shukla's testimony regarding when she authorized gas pump number one in relation to when she saw the two women fighting was also inconsistent with her previous statements. At trial, Shukla testified that she authorized a gas pump before Robinson came in the station and told her that there were two women fighting outside. Shukla said, "First I authorized the pump and then I saw them." In contrast, Shukla testified in her deposition that she did not remember if she saw the couple fighting before she authorized the pump. Furthermore, the order of events outlined in Shukla's written statement to police suggests that she also saw the two women in the station's parking lot and thought something was wrong before Robinson came into the station.

At trial, Shukla admitted that she may have authorized a gas pump for another customer during the five or ten minutes it took the women to leave the station's property. Yet, Shukla contended that this other customer was not Robinson, and both Robinson and Shukla testified that there were no customers outside at the gas pumps other than Robinson at the time.

Robinson's testimony suggested that Shukla authorized a gas pump after Robinson had told Shukla about the two women fighting. Based on her prior experience of working at a gas station, Robinson recognized that a beeping sound

10

informed the cashier that a gas pump needed to be activated.[5] Robinson testified

that she heard a beeping sound when she entered the Chevron station to have her

gas pump authorized. After being shown her deposition testimony that the sound

stopped "right after" she told Shukla to call the police, Robinson stated, "It wasn't

long, pretty much, yes." Robinson also noted that she did not ask Shukla to

authorize her own gas pump until after she talked to Shukla about the two women

fighting outside and showed Shukla where they were standing by gas pump

number one.

At some point, Shukla undisputably authorized gas pump number one at the

Chevron station for Muhammad. Shukla's testimony was inconsistent about

whether she looked at gas pump number one before authorizing it. Shukla first

testified that she did not remember if she had looked at gas pump number one

before authorizing it, then said, "Maybe yes." Charles Williams, the manager of

the Chevron station at the time, however, testified that Shukla told him after the

incident that she did not look at pump number one before activating it. Shukla

further testified that she could not see the dispensing area for pump number one

from her position behind the counter because her view was obstructed by

[5]It was undisputed at trial that the referenced beeping sound informed the Chevron cashier that a customer had lifted the lever on a gas pump to receive gas. In order for a customer to receive gas through the pump, the cashier must hit the "authorize pump" button. After the gas pump is authorized, the beeping sound stops.

11

advertising signs, a pillar, the gas pump itself, and a trash can.[6]

Muhammad told police, however, that Shukla did, in fact, look at gas pump number one before authorizing it. Muhammad stated that "[e]verybody was really helpful like the lady . . . in the store she just turned the pump on." Detective Christopher Twiggs asked, "Even though ya'll didn't have a car?" Muhammad responded, "Didn't even have a car right next to it, she just turned it on, she looked at us and just turned the pump on . . . ."

It is undisputed that Shukla authorized gas pump number one for Muhammad and Muhammad then sprayed sixty-five cents of gasoline on Antoine. Muhammad told police that she first sprayed gas on Antoine's front side, then Muhammad hugged Antoine so she could get the gasoline on herself too.[7]

---

[6]Shukla affirmed that she had received safety training from Chevron on procedures to be followed while customers were dispensing gasoline, including instruction that there was an automatic shut off button for the gas pumps. Shukla admitted though that she spoke little English when she started working at Chevron and her safety training was not conducted in her native language.

[7]We recognize that Muhammad told police that at this point Antoine told her, "if I burn you gonna burn," and Muhammad told her "okay." Muhammad also told police that Antoine just stood there while Muhammad sprayed gasoline on her and that Antoine told Muhammad to wet the back of her shirt with gas after she wet the front. However, in reviewing a district court's denial of a motion for judgment as a matter of law, we view all evidence in the light most favorable to Currie. Proctor v. Fluor Enters., Inc., 494 F.3d 1337, 1347 n.5 (11th Cir. 2007).

Further, as the district court properly instructed, the jury was free to "believe or disbelieve any witness, in whole or in part." Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 3 (2005 ed.). Given Robinson's testimony that Antoine attempted to get away from Muhammad, the jury could have found that this portion of Muhammad's statement was not credible, but still have chosen to believe other portions of Muhammad's statement.

12

Customer Robinson testified that she exited the gas station to return to her car to pump gas and immediately saw the two women "in the same position with the smaller one holding the larger lady." Before Robinson got to her car, Muhammad asked Robinson if she had a cigarette lighter. Robinson looked straight ahead and did not even look at the two women. Robinson responded that she did not smoke and did not have a lighter. Robinson then started to pump gas into her van and watched the two women from behind them as they left the Chevron station, with Muhammad still pulling Antoine by her shirt.

According to Muhammad's statement to the police, she and Antoine left the Chevron station and went back to their car. Muhammad then found a cigarette lighter inside her car. They stood face to face just a few feet from each other. Muhammad told police that she was holding on to Antoine and that they were arguing again. Muhammad flicked the cigarette lighter five to ten times until it lit. She then lit Antoine on fire.

Robinson testified that she saw a big puff of black smoke across the street. Robinson estimated that only five or six minutes passed between the time she first saw the two women come onto the station's property until she saw the puff of smoke. Robinson then saw Antoine, who was on fire from head to toe, running toward the gas station. Robinson ran to the middle of the street and shouted at

13

Antoine to roll over in the grass.

Jason Barrett, an employee of the Cherokee County Sheriff's Office at the time, was off-duty and saw a car parked in front of the restaurant across the street from the Chevron station. Barrett testified that he "[s]aw two females standing on the passenger-side area of the car. They were kind of putting their arms – I can't really describe it, but to me it looked like they were arguing about something, no fighting." Barrett testified that the two women were standing "maybe a foot" or "maybe a couple of feet" apart from each other. After he passed them, he looked in his rearview mirror and saw one of them burst into flames. Barrett turned around and parked behind their car. Antoine was on fire and running through the parking lot. Barrett ran after Antoine and told her to roll on the ground to put out the fire. Antoine did this briefly, but then stood up and ran around some more. Barrett then called 911. Antoine was taken to a hospital and, several weeks later, died as a result of the burns she suffered.

While Antoine was running around on fire, Barrett observed Muhammad get into her car. Barrett ordered her to stop, but Muhammad drove away. While police were still at the scene, Muhammad later returned to the same Chevron gas station in her car. According to Muhammad's statement to police, when she returned to the gas station, another customer at the station had prepaid for more gas

14

than she needed and gave Muhammad her last dollar of gas. Muhammad sprayed gas all over the inside of her car. Muhammad then drove her car across the street to where the police were gathered and lit the inside of her car on fire as she was driving.[8] Muhammad parked the car near the police and exited her car. The police drew their weapons and ordered her to the ground. Muhammad did not comply, and, according to Barrett, tried to get back into her car while it was still on fire. The police eventually took Muhammad into custody. Detective Twiggs later interviewed Muhammad, and she confessed to him that she had set Antoine on fire.[9]

### 3. Foreseeability of the Risk of Harm

Chevron presented expert testimony from Rosemary Erickson, Ph.D., a forensic sociologist, that it was not reasonably foreseeable to Shukla that Muhammad would douse Antoine with gas and set her on fire. Dr. Erickson based her opinion on a review of the depositions, the police records, the low crime rate in the area surrounding the Chevron station, the lack of previous violent crimes at this

---

[8]Detective Twiggs later recovered a journal from Muhammad's burned car that contained entries from both Muhammad and Antoine. Twiggs read at trial several of the journal entries written by Muhammad. In these entries, Muhammad had written: "I would kill her, but she is too young and she just need a little lesson, not the total package." Muhammad also had written: "And if she tries to hurt me, I could kill her and not get – or not get locked up," and "I can just hurt her in more ways than one and have my hands just clean."

[9]In 2004, Muhammad was indicted on criminal charges of murder, aggravated battery, aggravated assault, and arson.

15

specific Chevron station, and the rarity of the particular crime that occurred here.

In addition to Dr. Erickson's testimony, Shukla testified that she had never had a crime or fire at the Chevron station before that day and never had to call the police. Williams, the former Chevron station manager, testified that there had not been any criminal activity at the Chevron station in his eight to ten years working there before this incident.

However, in cross-examining Dr. Erickson, plaintiff's counsel asked, "You would agree with me . . . would you not, that if something is going on at a gas station and a clerk sees one person holding another at a gas pump and there's no car and no container, that it's foreseeable that the gas may be used inappropriately and harm can result . . . ." Dr. Erickson replied, "If all those factors were in evidence." Thus, even from Chevron's own witness, there was in effect testimony to support Currie's claim that Shukla should not have authorized the gas pump after Shukla saw Muhammad and Antoine fighting (or was told by Robinson they were fighting) and where Muhammad and Antoine had no car or gas container.[10]

## B. Jury Instructions

At the charge conference, Currie's counsel contended that the court's proposed jury charge on an intervening criminal act was inappropriate because the

_____

[10]Both Williams and Robinson also testified that they would not activate a gas pump if they saw people at the gas pump without a car or gas can.

plaintiff's primary theory of the case was that Shukla committed an affirmative act of negligence in activating the pump for Muhammad, not that Chevron failed to provide adequate safety for Muhammad. Currie's counsel even stated "[i]t is no longer a premises liability case . . . [t]hat's not even our claim." The district court commented, "for something that's not a premises liability case, both sides sure did submit a lot of premises liability charges." Currie's counsel responded, "I think there is a premises liability claim. It's not our main claim and it's not our underlying claim."

Chevron objected to the general charge on premises liability because it would be confusing to the jury when given with the instruction on third-party acts. After further discussion, the district court said that it would need to take some time to think about the instructions. The district court advised the parties that, "You will certainly have a copy of it in advance of when I read it and you will have an opportunity to object to it after I've read it . . . ."

After the close of the defense's case and closing arguments, the district court read the jury instructions. The district court then heard objections to the jury charges. Chevron objected, inter alia, to the district court's instructions on premises liability, intervening criminal acts, and superior knowledge.

C.    Jury Verdict

At the close of the trial, Chevron orally moved for judgment as a matter of law on numerous grounds. The district court denied Chevron's motion.

The jury returned a verdict finding Chevron liable and awarding Currie $3,500,000 in damages. The jury also found that Antoine was twenty-five percent liable. Accordingly, the district court reduced the damages award by twenty-five percent to $2,625,000 and entered judgment.

## D.    Renewed Motion for Judgment as a Matter of Law or New Trial

Chevron filed a written renewed motion for judgment as a matter of law or, alternatively, a new trial on the grounds that: (1) Currie failed to establish that Muhammad's criminal act was foreseeable or that Chevron had superior knowledge of the danger posed by Muhammad; (2) Antoine's failure to exercise ordinary care was the sole cause of her injuries; (3) Antoine assumed the risk of her injuries by not removing herself from the dangerous situation; and (4) Antoine could have avoided the consequences of Chevron's negligence through the exercise of ordinary care.

The district court denied Chevron's motion. The district court concluded that there was a sufficient evidentiary basis for the jury to conclude that this incident was foreseeable and that Chevron could have avoided Antoine's death. Specifically, the district court noted that there was evidence from which the jury

18

could have concluded that: (1) Shukla saw the couple fighting on Chevron property and saw Muhammad using force to lead Antoine to the gas pump before Shukla activated the pump; and (2) Robinson warned Shukla that something was going on with the two women outside and told Shukla to call the police. The district court also noted that the jury was "extensively" instructed on Georgia tort principles such as avoidance of consequences and the plaintiff's duty of care. Drawing all reasonable inferences in Currie's favor, the district court found that there was sufficient evidence to support the jury's verdict.

### E.    Evidence of Prior Incidents

Before trial, Chevron filed a motion in limine to exclude evidence of internal Chevron reports regarding three incidents at different Chevron stations. The three incidents involved: (1) kids in California who had filled a two-liter bottle with gasoline for their go kart and had the bottle ignite as they were leaving; (2) a customer in Louisiana who sprayed approximately ninety gallons of gasoline on the ground while proclaiming that it was water, not gasoline; and (3) a customer in Texas who lied to the cashier in saying he had a gasoline can, poured gasoline on himself, and lit himself on fire. Chevron argued that the reports were inadmissible because they were not similar to Muhammad's crime, were unduly prejudicial, were inadmissible hearsay, and contained evidence of subsequent remedial

19

measures.

At a pretrial hearing, Currie argued that the three incidents were relevant because they each involved instances where the cashier could not observe the gas pump. The district court determined that the inquiry as to relevance was whether the crime at issue was against property or a person. The district court found that the California and Louisiana incidents were not crimes against persons. While acknowledging that the Texas incident was a closer issue, the district court determined that this also was inadmissible because it did not occur at the same location and did not involve a crime against another person. The district court concluded, "So, again, this is preliminary. And, you know, if you think that the evidence takes a turn that I haven't anticipated, but I just – based on my review of Georgia law, I just don't think they come in, so I'm going to grant [Chevron's] motion in limine . . . ."

At the end of the first day of trial, Currie renewed her request to admit the evidence of the three prior incidents. The district court responded, "I'll take another look at it." There was no further discussion at trial of the three prior incidents.[11]

_____

[11]Because we affirm the district court's judgment in favor of Currie, it is unnecessary to address Currie's argument in her cross-appeal that, in the event that we grant relief in favor of Chevron, she was entitled to a new trial because the district court improperly excluded evidence of three prior incidents at Chevron gas stations that, Currie alleges, would have shown that the

## II. DISCUSSION

On appeal, Chevron argues that the district court erred in denying its motion for judgment as a matter of law, or, alternatively, a new trial on four grounds: (1) Muhammad's actions were not a reasonably foreseeable consequence of Shukla's negligence; (2) Antoine failed to exercise ordinary care to "avoid the consequences" of Shukla's negligence; (3) Antoine had equal or superior knowledge than Shukla of the risk of Muhammad's criminal conduct; and (4) Antoine's negligence was equal to or greater than Shukla's negligence.[12] In addition, Chevron argues that the district court erred in its jury instructions on premises liability, superior knowledge, and intervening criminal acts.[13]

After review of the record, as well as the well-presented arguments of the

---

injury here was foreseeable to Chevron.

[12]We review de novo a district court's ruling on a motion for judgment as a matter of law, viewing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party. Proctor, 494 F.3d at 1347 n.5. Judgment as a matter of law is appropriate where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant]." Fed. R. Civ. P. 50(a). Judgment as a matter of law must be denied "if there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir. 2006) (quotation marks and citation omitted). We review the denial of a motion for a new trial for an abuse of discretion. Action Marine, Inc. v. Cont'l Carbon Inc., 481 F.3d 1302, 1309 (11th Cir.), petition for cert. filed, 76 U.S.L.W. 3082 (U.S. Aug. 24, 2007) (No. 07-257).

[13]We review de novo whether a jury instruction accurately reflects the law, but give wide discretion to the district court as to the phrasing of the instructions. Wright v. CSX Transp., Inc., 375 F.3d 1252, 1256 (11th Cir. 2004).

parties in both their thorough briefs and at oral argument, we conclude that all of Chevron's claims of error lack merit. The only issues that warrant further discussion are Chevron's arguments that the district court erred in denying its motion for judgment as a matter of law or a new trial on the grounds that Muhammad's actions were not reasonably foreseeable to Shukla and that Antoine failed to avoid the consequences of Shukla's negligence.

## A.    Foreseeability

A cause of action for negligence in Georgia must contain the following elements: (1) a legal duty to conform to a standard of conduct for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage resulting from the breach of the legal duty. Watson v. Gen. Mech. Servs., 623 S.E.2d 679, 681 (Ga. Ct. App. 2005) (citing Bradley Ctr., Inc. v. Wessner, 296 S.E.2d 693 (Ga. 1982)).

In order to establish a breach of the applicable standard of conduct, there must be evidence that the alleged negligent act (or omission) created a foreseeable, unreasonable risk of harm. Id. at 681. "'That is, it must appear that the alleged negligent condition was such as to put an ordinarily prudent person on notice that some injury might result therefrom.'" Id. (quoting Ga. Power Co. v. Carden, 196

22

S.E.2d 477, 478 (Ga. Ct. App. 1973)). As to foreseeability of injury, Georgia courts have stated that "'in order for a party to be held liable for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result.'" Love v. Morehouse College, Inc., 652 S.E.2d 624, 626 (Ga. Ct. App. 2007) (quoting Freeman v. Wal-Mart Stores, 635 S.E.2d 399, 402 (Ga. Ct. App. 2006)).

In Georgia, questions of negligence, proximate cause, and foreseeability are generally for the jury, except in "plain, palpable and undisputed cases where reasonable minds cannot differ as to the conclusions to be reached." Ford v. Smith, 546 S.E.2d 346, 350 (Ga. Ct. App. 2001); Redding v. Tanner, 498 S.E.2d 156, 158 (Ga. Ct. App. 1998) (Andrews, C.J., concurring and dissenting); Murphy v. Wometco Cable TV of Fayette County, Inc., 478 S.E.2d 398, 399 (Ga. Ct. App. 1996); Wade v. Mitchell, 424 S.E.2d 810, 813 (Ga. Ct. App. 1992).[14]

Viewing the evidence in the light most favorable to Currie and making all

---

[14]Although these Georgia cases addressed these questions at the summary judgment stage, the Supreme Court has stated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251, 106 S. Ct. 2505, 2511-12 (1986)).

23

reasonable inferences in her favor, we conclude that reasonable minds could differ as to whether Shukla was aware at the moment she authorized gas pump number one that her action would create a foreseeable risk of injury to Antoine. There was evidence from which the jury could have inferred that Shukla was aware that Muhammad and Antoine were involved in a serious fight on the Chevron station's property. In her statement to police on the day of the incident, Shukla said that she saw the two women walking on the station's property, that Muhammad had "grabbed" and "pulled" Antoine by the front of her shirt, and that Shukla "thought something was wrong." Shukla also testified at trial that she saw the women fighting on the Chevron station's property and that one woman was holding the other by her shirt.

Robinson's testimony confirmed Shukla's observation that the fight was serious. Robinson testified that Muhammad had her fist wrapped tightly in Antoine's shirt and that Muhammad wrapped her hand even tighter in Antoine's shirt when Antoine try to pull away from her. Robinson herself described that Muhammad then pulled Antoine "down to the ground like an animal." Robinson was so concerned about the fight that she waited in her car until the women passed before she exited to pump her own gas.

There also was evidence from which the jury could have found that Shukla

24

was aware that Muhammad and Antoine were involved in a serious fight at the Chevron station <u>before</u> she activated gas pump number one for Muhammad. Robinson testified that, after observing Muhammad and Antoine fighting on the Chevron station's property, she entered the station, told Shukla that something was going on with the two women outside, showed Shukla where the two women were standing by gas pump number one, and asked Shukla to call the police. Robinson further testified that the beeping sound for a gas pump to be authorized stopped shortly after she asked Shukla to call the police, indicating that Shukla had authorized a gas pump. In addition to Robinson's testimony, Shukla's statement to police on the day of incident stated that she "saw 2 ladies walking in p. lot - did not see their car - she thought something was wrong. Customer came in they talked about the 2 women." Based on the order of events as relayed to the police by Shukla, together with Robinson's testimony outlined above, the jury could have concluded that Shukla saw the two women fighting on the station's property without a car and suspected something serious was wrong <u>before</u> she activated gas pump number one for Muhammad.

Finally, there was evidence from which the jury could have concluded that Shukla looked at Muhammad before authorizing gas pump number one. Muhammad told police on the day of the incident that "[e]verybody was really

helpful like the lady . . . in the store she just turned the pump on. . . . Didn't even have a car right next to it, she just turned it on, she looked at us and just turned the pump on . . . ." Based on Muhammad's statement and Shukla's own testimony, the jury could have found that Shukla looked at gas pump number one before she authorized it, saw Muhammad (who Shukla had seen fighting with Antoine on the station's property and had recognized did not have a car), and nevertheless authorized gas pump number one for Muhammad.[15]

Viewing the totality of this evidence in the light most favorable to Currie and making all reasonable inferences in her favor, the jury could have found that the beeping sound that Robinson heard inside the Chevron station was Muhammad seeking authorization of gas pump number one and that Shukla looked at Muhammad and authorized gas pump number one for her (thus stopping the beeping sound) after Shukla's conversation with Robinson. The jury also could

---

[15]Chevron insists that Muhammad's statement that Shukla looked at her before authorizing gas pump number one is "conclusively refuted by the evidence." However, it was within the province of the jury to decide whether to believe Muhammad's version of events. See Cleveland v. Home Shopping Network, 369 F.3d 1189, 1193 (11th Cir. 2004) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . .'" (quoting Reeves, 530 U.S. at 150, 120 S. Ct. at 2110)). Further, even without Muhammad's testimony, parts of Shukla's own testimony suggested she looked at gas pump number one before authorizing it. Even if the jury found that Shukla did not look at gas pump number one before authorizing it or that she looked at gas pump number one but could not see the dispensing area because of obstructions, the jury still could have inferred from the evidence that Shukla was aware that Muhammad and Antoine were at gas pump number one because Robinson had pointed out to Shukla that they were standing at the pump.

have found that Shukla was aware at the time that she authorized gas pump number one for Muhammad that: (1) Muhammad had been pulling Antoine around the Chevron station's property by her shirt as they were fighting; (2) the fight was sufficiently serious that Shukla herself thought something was wrong and that Robinson came into the station to warn Shukla that something was going on with the two women outside and to ask her to call the police; (3) Muhammad and Antoine were fighting by gas pump number one; and (4) Muhammad and Antoine did not have a car on the station's property. Dr. Erickson, Chevron's own expert witness on foreseeability, admitted that it was foreseeable that gasoline could be used improperly to injure someone in such a situation. Thus, we conclude that there was, at the very least, a substantial conflict in the evidence such that reasonable and fair-minded jurors might reach different conclusions as to whether Shukla was aware before she authorized gas pump number one that her negligent action would create a foreseeable risk of injury to Antoine.

In arguing that this incident was not foreseeable, Chevron cites Georgia premises liability cases providing that property owners have a duty to exercise ordinary care to protect invitees from foreseeable third-party criminal attacks where there are prior similar criminal acts occurring on the premises that put the property owner on notice of the dangerous condition. See Rice v. Six Flags Over

27

Ga., LLC, 572 S.E.2d 322, 325-26 (Ga. Ct. App. 2002); Johnson v. Atl. Hous. Auth., 532 S.E.2d 701, 703 (Ga. Ct. App. 2000). Chevron argues that the criminal attack by Muhammad on Antoine was not foreseeable because this particular Chevron station was in a low crime area and had not been the site of any criminal activity in previous years, much less violent crime.

First, while Currie raised a premises liability theory at trial, her primary theory of liability was that given the particularly serious events unfolding before Shukla and given Robinson's warning, Shukla then committed her own affirmative negligent act in activating gas pump number one for Muhammad, not that Chevron breached its duty to Antoine to keep its premises safe generally.[16]

Second, the lack of prior criminal activity at this Chevron station does not wholly foreclose the foreseeability issue. Even in cases grounded solely on a premises liability theory, Georgia courts have stated that "a showing of prior similar incidents on a proprietor's premises is not always required to establish that a danger was reasonably foreseeable. An absolute requirement of this nature would create the equivalent of a one free bite rule for premises liability, even if the

---

[16]As Currie's counsel explained at the jury charge conference:
[T]he defendants try to keep pigeonholing this case into a liability where Chevron fails to provide adequate safety for a customer. That's not it. . . . [T]he main thing is [Shukla] committed an affirmative act of negligence in turning on a gas pump under conditions which is justified in evidence – in the evidence in this case where one person is pulling another by the collar and a customer comes in and says, call the police. It's an act of negligence. It is no longer a premises liability case . . . .

28

proprietor otherwise knew that the danger existed." Wade v. Findlay Mgmt., Inc., 560 S.E.2d 283, 286 (Ga. Ct. App. 2002) (quotation marks omitted). This Court applied this same reasoning in a premises liability case to conclude that there was a jury question of whether hostilities throughout the evening of which bowling alley employees were, or should have been, aware were sufficient to make it reasonably foreseeable to them that a fight would erupt, even though there had been no similar prior altercations on the premises. Bishop v. Fair Lanes Ga. Bowling, Inc., 803 F.2d 1548, 1551-52 (11th Cir. 1986). Similarly, in this case, there was a sufficient conflict in the evidence for reasonable minds to differ as to whether the particular serious and exigent events unfolding right before Shukla at the Chevron station that morning, together along with Robinson's warning, should have put her on notice that activating the gas pump for Muhammad would pose an unreasonable risk of harm to Antoine, even though there were was no history of prior similar incidents at this specific Chevron station.

Therefore, we cannot say that the district court erred in denying Chevron's motion for judgment as a matter of law or a new trial on the grounds that it was not foreseeable to Shukla that her negligent act of activating the gas pump for Muhammad would create a foreseeable risk of injury to Antoine.

**B.    Avoidance of Consequences**

29

Chevron also argues that even if Shukla was negligent in activating the gas pump for Muhammad, Antoine is barred from recovery under Georgia law because she could have avoided the consequences of Shukla's negligence by exercising ordinary care for her own safety.

Georgia has a well-established avoidance-of-consequences doctrine, as well as a separate comparative negligence rule, in O.C.G.A. § 51-11-7, which provides that:

> If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. In other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained.

O.C.G.A. § 51-11-7. Under the first sentence of § 51-11-7, which states the avoidance-of-consequences doctrine, a plaintiff must "'avoid the effect of the [defendants'] negligence after it becomes apparent to him or in the exercise of ordinary care he should have learned of it. He must make use of all his senses in a reasonable measure amounting to ordinary care in discovering and avoiding those things that might cause hurt to him.'" Lowery's Tavern, Inc. v. Dudukovich, 507 S.E.2d 851, 854 (Ga. Ct. App. 1998) (quoting Alterman Foods, Inc. v. Ligon, 272 S.E.2d 327, 330 (Ga. Ct. App. 1980)) (alteration in original). Georgia courts have described the avoidance-of-consequences doctrine as "Georgia's contributory negligence rule," Whelan v. Moone, 531 S.E.2d 727, 730 (Ga. Ct. App. 2000), and

30

"a form of the last clear chance doctrine," Muldovan v. McEachern, 523 S.E.2d 566, 571 (Ga. Ct. App. 1999) (Benham, C.J., concurring).

In contrast, the second sentence of § 51-11-7 embodies Georgia's comparative negligence rule that a plaintiff may recover if her own negligence contributed to her injury so long as the plaintiff's negligence was not "equal to or greater than" the defendant's negligence, but reduces the amount of recovery in proportion to the plaintiff's fault. See Whelan, 531 S.E.2d at 730.

Under Georgia law, questions of whether an individual by ordinary care could have avoided the consequences of another's negligence are generally for the jury, except in plain, palpable, and undisputed cases. Bass Custom Landscapes, Inc. v. Cunard, 575 S.E.2d 17, 20 (Ga. Ct. App. 2002); Ford, 546 S.E.2d at 350; Murphy, 478 S.E.2d at 399; Mitchell, 424 S.E.2d at 813.

Viewing the evidence in the light most favorable to Currie and making all reasonable inferences in her favor, we conclude that there was a sufficient conflict in the evidence for reasonable minds to differ as to whether Antoine by ordinary care could have avoided the consequences of Shukla's negligent act of authorizing gas pump number one for Muhammad. There was evidence from which the jury could have found that Antoine was familiar with Muhammad's hostile tendencies and had learned how to calm Muhammad down in such situations. Antoine had

31

known Muhammad for over a year, dated her for several months, and lived with her for a brief period of time. According to Antoine's friend Manus, Muhammad had exhibited violent tendencies in the past towards Antoine and others. Manus specifically referenced one incident where Muhammad was agitated at Nicole, a woman whom Antoine had dated briefly, and was yelling threats at her. Antoine successfully convinced Muhammad to get into their car to leave the scene and prevented any escalation of the situation.

The jury could have found that, on this morning at the Chevron station, Muhammad continued to argue with Antoine and hold her by the shirt after Shukla negligently authorized the gas pump and after Muhammad sprayed gasoline on Antoine based on: (1) testimony from Robinson, who watched the women leave the Chevron station, that Muhammad had her fist wrapped in Antoine's shirt the entire time she saw them; (2) Muhammad's statement to police that she was holding on to Antoine as they were standing by their car and that they were still arguing; and (3) Barrett's testimony that the two women were close together and arguing when he drove by them. In light of this situation and the fact that, according to Robinson, Muhammad had tightened her grip on Antoine's shirt when Antoine had tried to break free from her grasp earlier, the jury could have found that Antoine decided, based on her prior experiences with Muhammad, that she

32

should try to calm Muhammad down, rather than risk escalating the situation by attempting to physically resist her or flee. While this may not have been the only reasonable course of action Antoine could have taken, we conclude that this evidence created a sufficient conflict for reasonable minds to differ as to whether Antoine exercised ordinary care to avoid the consequences of Shukla's negligent act of authorizing gas pump number one for Muhammad.[17]

Finally, we note that Chevron argues that the jury must have found that Antoine failed to avoid the consequences of Chevron's negligence because it found that Antoine was twenty-five percent liable for her injuries. Chevron contends that "[t]he only alleged negligence was Antoine's failure to avoid harm. Thus, if the jury had followed the district court's instructions, it should have returned a verdict

---

[17]The Georgia cases cited by Chevron in its brief and at oral argument on this defense are inapposite. Four of the five cases involved a landowner's duty to keep its premises safe under O.C.G.A. § 51-3-1 and the defense that the plaintiff had equal or superior knowledge of the dangerous condition on the property. Rice, 572 S.E.2d at 325-27; Atl. Hous. Auth., 532 S.E.2d at 703-05; Johnson v. Holiday Food Stores, 520 S.E.2d 502, 504-05 (Ga. Ct. App. 1999); Griffin v. AAA Auto Club S., Inc., 470 S.E.2d 474, 476-77 (Ga. Ct. App. 1996). Thus, these cases applied a different defense raised by Chevron, not the avoidance-of-consequences doctrine.

Chevron also cites Quiktrip Corp. v. Fesenko, 491 S.E.2d 504, 505 (Ga. Ct. App. 1997), in which the Georgia Court of Appeals applied the avoidance-of-consequences doctrine in § 51-11-7 and concluded, as a matter of law, that a plaintiff failed to exercise care for her own safety when she held an allegedly defective gasoline pump that was gushing gasoline over her head for three to five minutes. 491 S.E.2d at 505-06. Although both Quiktrip and this case involved incidents at a gasoline station, the scenario of an individual putting a malfunctioning gasoline pump over her own head is not comparable to the situation here where Muhammad dragged Antoine around the Chevron station's property by her shirt, tightened her grip on Antoine after she tried to break free, and then poured gasoline on her. Thus, this case is materially different from Quiktrip.

33

of no liability for Chevron."

The record demonstrates, however, that the district court properly instructed the jury on Georgia law and that the jury followed the district court's instructions. The district court first explained Georgia's comparative negligence principles to the jury:

> [I]f you find that the accident was due partly to the fault of Nodiana Antoine, that Nodiana Antoine was negligent . . . for example, 25 percent responsible for her injuries, then you would fill in that percentage [as] your finding on the special verdict form. . . . Such a finding would not prevent the plaintiff from recovery, but I would reduce any award that you make to the plaintiff by the percentage that you insert. . . .
>
> On the other hand, if you find that Nodiana Antoine's negligence equaled or exceeded the defendants' negligence, then Ms. Currie cannot recover at all.

The district court then separately instructed the jury on the avoidance-of-consequences doctrine:

> If Nodiana Antoine, by the exercise of ordinary care, could have avoided the consequences caused by Chevron's negligence, then she is not entitled to recover. . . . In other cases, a defendant is not relieved even though a plaintiff may have contributed to the injury sustained. A plaintiff's duty to exercise ordinary care to avoid the consequences of a defendant's negligence does not arise until the defendant's negligence exists and the plaintiff knew or, in the exercise of ordinary care, should have known of such negligence.

The jury's verdict here reflects that it followed Georgia law and the district court's instructions by consistently finding that: (1) under the comparative

34

negligence rule in the second sentence of § 51-11-7, Antoine's own negligence contributed in part to her injuries and accounted for twenty-five percent of the liability; but (2) under the first sentence of § 51-11-7, Chevron did not show that, after Shukla's negligent act, Antoine by ordinary care could have avoided the consequences caused by Shukla's negligence.

Accordingly, we conclude that the district court did not err in denying Chevron's motion for judgment as a matter of law or a new trial on the ground that Antoine failed to exercise ordinary care for her own safety to avoid the consequences of Shukla's negligence.

**AFFIRMED.**